ORIGINAL

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

BRIAN DUNN,                          )
                                     )
            Plaintiff,               )
                                     )
v.                                   )     Civil Action No. CV404-025
                                     )
CSX TRANSPORTATION, INC.,            )
                                     )
            Defendant.               )

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

The within is Plaintiff's brief in support of his Motion for Partial Summary Judgment, as follows:

### FACTS

**A.    GENERAL BACKGROUND**

On January 17, 2003, Plaintiff Brian Dunn was employed as a railroad switchman/foreman by Railserve Corporation. Railserve Corporation, Mr Dunn's employer, has a contract with International Paper, formerly Union Camp, to move railcars within International Paper's paper and pulp mill in Savannah. (Attachment B; Tim Benjamin Deposition, pp 7-11, 20-26, 31-32.)

Railcars are delivered to International Paper premises by various railroads, primarily by Defendant CSX Transportation and Norfolk Southern. The cars are delivered to the premises by employees of the railroad owning the cars being delivered  They are deposited on a "receiving track". Railserve employees then move the cars from the receiving track into the International Paper "holding yard". (William Black Depo., pp. 10-15, Benjamin Depo., pp. 20-26; Thomas Conner Depo, pp. 26-29; Thomas Kelly Depo , pp. 39-42, 74.)

The railcars then remain in the holding yard until Railserve is notified by International Paper employees that a particular car or "cut" of cars should be brought into the mill proper to be

"spotted". "Spotted" means to move the car to the appropriate "spot" where it is to be loaded at the mill. (Black Depo., pp. 16-20.)

While in the holding yard, Railserve will "classify" the cars onto separate tracks, numbered 0 to 15, essentially separating cars by where they are going or when they will be needed. (Black Depo., pp. 11-26.)

Movement of the cars around the hold yard and from the hold yard to the mill itself is done by Railserve employees using a Railserve locomotive. International Paper employees do not move the railcars, but rather, Railserve employees perform this service pursuant to written contract, a copy of which is in the record. (Black Depo., pp. 23-26, and Depo Exh. 4; Benjamin Depo., pp. 20-27.)

The evidence of record is that Railserve does not perform mechanical inspections of the cars to determine if cars are or may be mechanically damaged or defective. (Black Depo., pp. 40-47, 77-80, 87; Benjamin Depo., pp. 31-38.) Rather, the railroad owning the car, in this case, CSX Transportation, has the duty to inspect the car for defects in its yard before delivering the car to International Paper. (Conner Depo., pp 14-17; Benjamin Depo., pp. 35, 39; Black Depo., p. 100.) The railroads are required to utilize an inspector certified by the Federal Railway Administration ("FRA") for this purpose. (Black Depo., p. 100.)

If a mechanical defect on a car happens to be noticed by a Railserve employee, the protocol is for Railserve to report the defect to CSX or whichever railroad owns the car. Neither Railserve nor International Paper repair or maintain CSX or Norfolk Southern cars which are delivered to the mill. This remains solely the responsibility of the delivering railroad. (Benjamin Depo., pp. 31-35, 38, 40-47.) Many times the railroad will send their employees onto the track where the car is located to repair the defect in place, especially if the defect involves a safety appliance such as a step, ladder rung, or the like. (Kelly Depo., p. 80.)

Railserve's only function is to move the cars around inside the premises of International Paper, or between its holding yard and the mill, after the car is delivered by the railroad. Once the

2

car is loaded, Railserve moves the car back to an "outgoing" track. The railroad then picks up the car from the outgoing track. Railserve uses only locomotives to move the cars. (Black Depo., pp. 17-18.) It uses no other moving rail equipment nor track mobiles to move the equipment, and no moving equipment is used inside the hold yard other than a railroad locomotive. (Black Depo., pp. 17-18, 75; Benjamin Depo., pp. 7-11, 22-26, 31-37.)

On occasion, if a railcar is damaged or caused to be damaged by a Railserve employee or International Paper employee, there is a written policy requiring that the defect be reported on a derailment or damage report form. Testimony in the record is that Railserve maintains a relatively small work force at International Paper, and if damage to a car occurs at the hands of a Railserve crew, or while being handled by a Railserve or International Paper employee, it generally becomes common knowledge in the office. (Benjamin Depo., pp. 18-21, 41, 53-56; Black Depo., pp 80-81.)

As noted above, if a car is damaged or defective when delivered to International Paper by the railroad, or on the rare occasion when damage is caused to a car already on the premises, same is reported. CSX, upon notification, undertakes its own repairs, using its own employees and personnel. (Kelly Depo., p. 80; Black Depo., pp. 41-43, 58-60, 85.)

### B. CSX MAINTAINS ITS OWN TRACK, WHICH TRAVERSES INTERNATIONAL PAPER PREMISES

It is very important to note that CSX's main line track extends onto International Paper plant premises. These tracks are known as the CSX "main line" tracks. This "main line" must be utilized by Railserve when taking a cut or small train of cars from the hold yard to the plant to be spotted for loading (Dunn Depo., pp. 95-97, 107, 181; Black Depo. Depo., pp. 82-83, 87, 96, 98-99, 100-101, 105.)

This main line track belongs to CSX and extends not only onto International Paper premises, but through and beyond International Paper premises, also serving industries further up the river, including Colonial Oil facilities located well outside and beyond International Paper premises (Black Depo , p. 21, and Depo. Exh. 7 ) The evidence is that CSX owns these tracks,

3

maintains and keeps those tracks in repair with its own employees, and does not allow access to this main line track without prior permission. (Black Depo. Exh. 7, ¶ 4, which states that: "Railroad shall maintain the leased tracks at its expense.")

In this regard, it is undisputed that Railserve employees, while moving cars, including CSX cars, from the International Paper hold yard to the mill, must, *en route*, enter onto CSX's main line track in order to reach the mill site. Before entering onto the CSX main line track, Railserve employees must actually call the CSX yard tower, located at the CSX rail yard, and obtain permission to enter onto CSX's main line tracks. (Contract between Union Camp/CSX; Black Depo. Exh 7, ¶¶ 5, 6; Black Depo., pp. 82-83, 87, 96, 98-99, 100-105.) This is because CSX continues to utilize the track for purposes of servicing other Savannah River industries, including Colonial Oil, with its own trains. (Dunn Depo., p. 179; Black Depo. Exh. 7.)

The Railserve crew remains subject to direction from the CSX yard tower while on the CSX main line as it traverses International Paper premises. (Black Depo , pp. 96-105.) In this regard, the contract between CSX and International Paper's predecessor, Union Camp, provides that CSX trains have "at all times" superior rights over movements being made on the tracks by equipment being utilized by Union Camp. (Black Depo. Exh. 7, ¶ 5; Black Depo., pp. 99, 101.) Railserve employees remain subject to CSX's operating rules while on those tracks. (Black Depo. Exh. 7, ¶ 9.) Railserve employees are also subject to "orders, instructions and directions" from the CSX division manager while on those tracks. (Black Depo. Exh 7, ¶ 9 )

### C. WRITTEN CONTRACTS

As just noted, the relation between International Paper and CSX is set forth in a written agreement of record. (Black Depo. Exh. 7; see also Attach. A.) An agreement also sets forth the relation between Railserve and International Paper. No contractual relation exists between Railserve and CSX directly. (Black Depo. Exh. 4; see also Attach B; Karen Mohler Depo.) Railserve essentially acts as a contractor for International Paper in moving the cars.

4

### D.  THE DAY IN QUESTION

On January 17, 2003, at approximately 10:00 p.m., Brian Dunn and two (2) Railserve crew members, including an engineer and switchman, were moving a number of railcars out of the International Paper hold yard. The cars included empty boxcars and were being taken into the International Paper mill to be "spotted" for loading. One (1) car in this group was CSX boxcar numbered 11635, which is undisputedly owned by CSX. (Dunn Depo., pp. 95-103, 109-111, 116, 155.)

The car (CSX # 11635) had previously been delivered to International Paper premises by a CSX train crew on or about January 5, 2003. (Kelly Depo., pp. 15-16; Conner Depo., pp. 38-42.) According to CSX's records, that car had been inspected by a CSX car inspector, working alone, on January 5, 2003, as part of a 35-car train, before being delivered to International Paper. (Kelly Depo., pp. 16, 42, and Depo. Exh P-3.) The record shows that, most times, large trains are inspected by at least two (2) inspectors. On this occasion, however, there is evidence that the entire 35-car train was inspected by a single inspector. That inspector's report indicates that his inspection of the entire length of the 35-car train, which is supposed to include a walk down both sides of the train, took approximately 33 minutes. (Kelly Depo. Exh. P-3.) Testimony is that cars average approximately 55 feet in length, the train thus being at least 1815 feet long.

That inspector, however, did not recall this particular train. Moreover, he did not recall this particular car in question, nor was there any particular documentation for this car to indicate that it was, in fact, inspected. (Barner Depo., pp 20-21.) The records merely show that the train containing this car received a "brake test". (Kelly Depo., p. 27.) No specific documentation has been produced indicating that any further inspection was done. (Kelly Depo., pp. 28-29, 35.)

On the night of January 17, 2003, Brian Dunn and the Railserve crew took the cars, including car #11635, out of the hold yard. They then asked for and obtained permission from CSX to enter onto the CSX main line so as to proceed down CSX's main line and into the mill section of

5

International Paper premises. After waiting to enter, permission was finally granted and they proceeded in It was by this point in time well after dark (Dunn Depo., pp. 95-97, 101-103.)

Mr. Dunn, pursuant to his duties, got off of the train to help "flag" a crossing so as to warn approaching motorists of the existence of the train. This flagging was done at the main entrance to International Paper premises where the main line crosses the entrance road. He subsequently attempted to get back up onto the train to ride it into the mill. The train was moving across the roadway about 3-4 m.p.h. In doing so, Mr. Dunn then attempted, as is customary, to step up onto one of the slowly moving railcars, in this case, CSX # 11635. (Dunn Depo., pp 98-103.)

Upon so doing, Mr. Dunn testified that he shined his railroad lantern, consisting of a battery-powered light, onto the ladder of the moving car and onto the sill step. He then grabbed hold of a ladder rung on the side of the car and placed one of his feet into the sill step stirrup. As he went to pull up, he immediately felt the ladder rung giving way, allowing him to fall away from the side of the car. He immediately grabbed with his right hand for the next higher rung, but by this point his foot had slipped from the stirrup and he was essentially left dangling on the side of the car from the ladder by his right hand. He was afraid to turn loose for fear of falling under the wheels of the moving train. He continued to hang by his right arm until he could radio the engineer to stop the train. (Dunn Depo., pp. 95-103, 109-115, 176.)

The testimony is thus undisputed that the injury occurred on a CSX railcar which had been delivered to International Paper by a CSX rail crew after having purportedly being inspected by a CSX car inspector. (Dunn Depo., p. 179; Conner Depo., pp. 14-17, 26-28, 38-44.) CSX is the only entity charged with responsibility of providing a mechanical inspection of the car. The incident occurred on the CSX main line track. (Black Depo., pp. 82-83, 87, 96, 103-105 ) This area could only be entered by permission of CSX by radio from its tower in its rail yard and the train remained subject to CSX's ultimate direction until exiting the main line. The injury occurred before the train was able to proceed out of the main line track. (Dunn Depo., pp. 95-97, 107, 181, Conner Depo., pp. 43-46.)

6

After the train was brought to a stop, a light was shown on the ladder rung, where it could be seen that one of the two bolts attaching the rung to the side of the car had pulled out and the ladder rung was not attached at one end. [Please see photos taken immediately thereafter.] (Dunn Depo., pp. 114-16; Black Depo., pp. 54-56, 76, 88, 91-94, Benjamin Depo , pp. 27-30.)

Testimony in the record is that the hole and the metal surrounding the hole where the bolt had been was rusty  William Black, an employee of International Paper who investigated the incident for that company and who has been working around railroad cars delivered to Union Camp and International Paper for years, testified that the rust did not look fresh and that there were no fresh gouge or scrape marks around the hole. (Black Depo , pp  55-56, 76-77, 79-81, 85, 97.)

Mr. Black testified, as did others, that the rung appeared to have lost its bolt secondary to when something scraped a relatively small portion of the corner of the car. (Black Depo., pp. 85-86.) The scrape was about the height one would expect if scraped by equipment on the loading dock, such as a forklift tine. Of course, the car was still on the way to be spotted for loading at International Paper when the injury occurred, and had thus not yet been taken to a position where it would have been contacted by forklifts at International Paper  (Black Depo., pp. 62, 75; Dunn Depo., p. 116.)

Moreover, the testimony of Tim Benjamin at Railserve was that no report of any damage to any car was made during the approximately twelve (12) days that the car was on International Paper premises (January 5th - January 17th). (Benjamin Depo., pp. 18-21, 41, 53-56; Black Depo , p. 80.) He and Black both concluded that the ladder rung had been damaged and lost its attachments, including the bolt, for a relatively long period, and certainly prior to the car being delivered to International Paper premises by CSX. They both concluded that CSX car inspectors negligently failed to detect the missing bolt and nut from the rung prior to its delivery to International Paper. (Black Depo., pp. 55-56, 76-77, 79-81, 85, 97; Benjamin Depo., pp. 31-35, 41, 53-56 )

7

## THEORIES OF LIABILITY

Plaintiff Brian Dunn alleges that he was injured and that CSX Transportation is liable based essentially on two (2) theories of recovery:

First, Brian Dunn contends that Defendant CSX provided railcar number 11635 in violation of the Safety Appliance Act, thus constituting negligence *per se* under Georgia law.

In this regard, the evidence shows that the car belonged to CSX, the car was solely maintained and repaired by CSX, the car was to be inspected by CSX prior to being delivered to International Paper premises, and the injury occurred on CSX's main line tracks, which are also repaired and maintained solely by CSX. Dunn and his other crew members entered onto that line only pursuant to direction and permission of the CSX yard tower. As such, Brian Dunn contends that the evidence is undisputed that the car was "on the line" of CSX at the time of his injury and Defendant CSX was negligent *per se*, pursuant to Georgia law, when Mr. Dunn was indisputably injured as the result of a Safety Appliance Act violation. 49 U.S.C. § 20301(a)(1)(c)(2).

*Alternatively, Plaintiff contends that Defendant was negligent in its repair and maintenance of the car, including the defective handhold, and was negligent in its inspection of the car prior to delivery of the car to International Paper premises. This alternative assertion is essentially a common law negligence claim asserted under Georgia law.*

Plaintiff moves for partial summary judgment solely under the first theory, above, the Safety Appliance Act violation, conceding, as he must, that a question of fact exists as to the common law negligence theory which would not be amenable to summary adjudication.

## ARGUMENT AND CITATION OF AUTHORITY

### I.   **STANDARD OF REVIEW**

Summary judgment may only be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as

8

a matter of law." FRCP § 26; Great Lakes Dredge and Dock Co. v. Miller, 957 F.2d 1575, 1578 (11th Cir. 1992).

"A party seeking summary judgment always bears the initial responsibility of informing the District Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 2552 (1986).

In determining whether movant is entitled to summary judgment, the District Court is required to review the evidence and all reasonable factual inferences arising from it in the light most favorable to the non-moving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992). This must be done without weighing conflicting evidence. McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 934 (11th Cir. 1987). While a mere "scintilla" of evidence supporting an opposing party's position will not suffice to oppose an otherwise properly supported motion for summary judgment, nonetheless, where a reasonable fact-finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

II. **PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT IN HIS FAVOR AS A MATTER OF LAW AS TO THE ISSUE OF WHETHER DEFENDANT VIOLATED THE SAFETY APPLIANCE ACT BY PROVIDING A RAILCAR ON ITS LINE WITH A DEFECTIVE HANDHOLD, THUS CONSTITUTING NEGLIGENCE *PER SE* UNDER GEORGIA LAW (49 U.S.C. § 20301(a))**

In Rouse v. CSX Trans., Inc., 722 F. Supp. 751 (S.D. Ga. 1989), a strikingly similar scenario was presented.

Rouse was an employee of Rail Switching Services, Inc., the predecessor corporation of Railserve, by whom Plaintiff Dunn was employed in this case. Rouse, like Dunn, was injured while attempting to mount a CSX railcar on Union Camp premises in Savannah. Of course, Union Camp

9

is the predecessor corporation of International Paper, which owned the paper mill premises where Dunn was injured.

The evidence in <u>Rouse</u>, <u>supra</u>, as in the case at hand, was that "CSX delivers freight cars to Union Camp's rail yard, where the cars are loaded or unloaded by Union Camp employees." <u>Rouse</u> at 752. The Court further noted that, "While the cars are on Union Camp's tracks, Rail Switching, under contract to Union Camp, provides switching services. These 'switching services' involve classifying cars according to the type of freight they contain and moving the cars to different tracks at the paper mill. Once Union Camp is finished with the car, Rail Switching moves the car to an outbound track in the rail yard to be picked up by CSX. Rail Switching operates three locomotives at Union Camp to move the cars, but neither Rail Switching or Union Camp owns the freight cars. The car that injured Rouse belonged to CSX." <u>Id.</u> at 752.

Also in <u>Rouse</u>, just as in the case at hand, it was noted that, "Before a car leaves CSX's holding yard, CSX inspects it to be sure its equipment is in safe working order. . Neither Rail Switching nor Union Camp inspects or repairs freight cars  Union Camp's contract with CSX contains a provision calling for Union Camp to inspect cars upon their arrival at the mill, but the provision is apparently unenforced." <u>Id.</u>

Defendant CSX in the <u>Rouse</u> case moved for summary judgment on the common law negligence claim asserted by Rouse on the grounds that it utilized reasonable care as a matter of law in inspecting the rail car. That motion was denied  <u>Id.</u> at 753. Defendant CSX also sought summary judgment on the applicability of the Safety Appliance Act, arguing that violation of the Safety Appliance Act was not actionable "because the car that injured Rouse was not 'on its line' within the meaning of the Act." That motion by the Defendant was also denied, based upon the above facts. <u>Id.</u> at 756.

The Court, however, granted plaintiff Rouse's motion for partial summary judgment on the issue of applicability of the Safety Appliance Act as constituting negligence *per se* under Georgia law.

10

In considering Rouse's motion for partial summary judgment, the Court stated, "Plaintiffs are proceeding under Georgia law, rather than under the Safety Appliance Act, which does not provide for a private cause of action." [Cits.] Georgia law provides that the violation of a statute can constitute negligence *per se* if the person seeking to invoke the statute is a member of the class which the statute is intended to protect.... [Cits.] Id. at 753

"If Plaintiff is a member of a protected class, he can invoke the Act's absolute liability standard by a showing that his injuries stem from a defect in a required safety appliance." Id. at 753.

The Court also noted that in determining whether the Plaintiff was a member of a protected class of beneficiaries for purposes of negligence *per se*, the car must, by the very terms of the Safety Appliance Act, be "'on the railroad line' within the meaning of the Act at the time of the accident." Id. at 753.

The Court, in discussing the "on the line" requirement, stated that, "It is well settled that a car need not be on tracks owned by the railroad to be considered 'on [the railroad's] line' for purposes of the Safety Appliance Act. [Cits.]"  This Court then summarized numerous decisions as to when a railroad car is considered to remain within the control of a railroad so as to be "on its line" even when the railcar is being loaded or unloaded on tracks owned by an industrial facility served by the railroad.

This Court concluded that it is only when an industrial facility is found to be a "private railroad system" that the industry would be considered in "control" of a railcar, as opposed to it remaining in control of the delivering railroad which had deposited it on the industry's tracks  In this regard, "The most significant factors in determining whether an industrial user runs a 'private railroad system' are whether it employs engines to move cars on its tracks and whether it inspects and repairs cars." Id. at 755.

In Rouse, the Court concluded that although Union Camp/Rail Switching employed engines to move cars, it "asserts no responsibility for maintenance of the railroad cars and is 'completely

11

reliant upon the railroad for the safe condition of the car delivered.' [Cits.] CSX's pre-delivery inspection of a car headed for Union Camp's mill is the final inspection of the car until the car is returned to CSX for transport. This is true, although an unenforced provision in Union Camp's contract with CSX calls for Union Camp to perform inspections. Furthermore, neither Union Camp nor Rail Switching maintains facilities to repair railroad cars. If a Union Camp or Rail Switching employee notices a problem with a car, the employee calls CSX." Id. at 755.

Based upon all of the above, the Court in Rouse granted partial summary judgment in favor of the plaintiff, holding as a matter of law that the CSX-owned rail car was still "on the line" of CSX at the time of plaintiff's injury, even though it was on tracks actually owned by Union Camp and was being moved by Rail Switching employees at the time. The Court concluded that because only CSX had the ability to mechanically inspect, repair and maintain the cars, for all intents and purposes, the car was still on its line while temporarily being handled by Rail Switching employees at the behest of Union Camp. Thus, the Court concluded that Rouse was within the class of protected persons under the Safety Appliance Act and that violation of the Act would constitute, as a matter of law, negligence *per se* under Georgia law.

Other decisions discussing the same or related issues include: Hahn v. Term. R Co., 355 S.W.2d 867 (1962); Hood v. Balto. & Ohio R. Co., 259 S.W. 471 (1924); and other decisions surveyed by the Court in Rouse, supra.

## III.   ROUSE AS APPLIED TO THE WITHIN CASE

The case at hand is even stronger for application of negligence *per se* in this context than was the situation in Rouse, supra.

Here, the undisputed facts are as follows:

1.   Dunn was injured on January 17, 2003, on a defective handhold, while attempting to mount CSX car no. 11635. A handhold is a safety appliance  49 U.S.C. § 20301(a). That car had been delivered to International Paper premises by a CSX rail crew on or about January 5,

2003 (Dunn Depo., pp. 95-103, 109-111, 179; Conner Depo., pp. 14-17, 26-28, 38-45; Kelly Depo., p. 80; Benjamin Depo., pp. 31-39; Black Depo., pp. 40-47, 77-80, 87.)

2. International Paper/Railserve depend entirely on CSX for inspections of CSX railcars prior to delivery of the car to International Paper. (Black Depo., pp. 40-47, 58-60, 77-80, 87, 100; Benjamin Depo., pp. 31-35, 40-47.)

3. Neither International Paper nor Railserve employ car inspectors. International Paper/Railserve depend upon CSX to perform inspections on cars prior to CSX delivering their cars to International Paper premises. As in Rouse, supra, when a Railserve employee happens to notice a defective or dangerous condition on a railcar, Railserve then reports the condition to CSX for CSX to conduct repairs, if it so chooses. (Black Depo., pp. 40-47, 58-60, 77-80, 87, 100; Benjamin Depo., pp. 18-21, 31-35, 40-47, 53-56.)

4. Neither International Paper nor Railserve have any duties or responsibility for repairing defects or problems with CSX railcars. The car in question was in fact repaired by CSX, which sent its employees to International Paper to repair the car in place. (Benjamin Depo., pp. 31-35, 40-47; Kelly Depo., p. 80; Black Depo., pp. 41-43, 58-60, 85 )

5. In this case (which makes the within case stronger even than Rouse), the car in question at the time of the injury was still located on CSX's main line track, which passes through International Paper premises. As such, this was a CSX-owned car, which had been inspected by a CSX car inspector, and then delivered onto International Paper premises by CSX employees. When the injury occurred, it was situated on CSX-owned and -maintained track. The evidence is undisputed that CSX continues to use its own mainline track, which happens to pass through International Paper premises, to run its trains to other industries further up the Savannah River. International Paper/Rail Serve cannot utilize or even enter onto the CSX track without first calling CSX's yard tower and obtaining prior permission. Once on the tracks, they are subject to direction from the CSX yard tower. (Black Depo., pp. 21, 82-83, 87, 96, 98-99, 101-103; Black Depo Exh 7, Attach A; Dunn Depo., pp. 95-103, 107, 181 )

Hence, on the within Motion, the Court need not even reach the issue addressed by the Court in Rouse, supra, in that the CSX car was still on the CSX line itself when the injury occurred. Moreover, even had the car been on International Paper tracks at the time of the injury (which it was not), Rouse, supra, would still mandate partial summary judgment in favor of Plaintiff as the car would remain "on the line" of CSX even while on International Paper-owned tracks due to the considerations set forth in Rouse as applied to this almost identical case.

## CONCLUSION

For all of the above reasons, Plaintiff Brian Dunn submits that his Motion for Partial Summary Judgment should be granted.

Dated this 11th day of January, 2005.

**JONES, BOYKIN, STACY & ASSOCIATES, P.C.**

By: _____
NOBLE L. BOYKIN, JR.
Georgia State Bar No. 073400
*Attorney for Plaintiff BRIAN DUNN*

213 E. 38th Street
Savannah, GA 31401
(912) 236-6161

14